**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NEW YORK**
_____

|  |  |  |
|---|---|---|
| **ROBERT MULVANEY,** | | **COMPLAINT** |
| | **Plaintiff,** | |
| - v - | | **JURY TRIAL DEMANDED** |
| **CITY OF ROCHESTER,** | | |
| **LAURA C. MILLER,** | | **Civil Action No.: 6:18-CV-6367** |
| | **Defendants.** | |

_____

## PRELIMINARY STATEMENT

Plaintiff, Robert Mulvaney ("Mr. Mulvaney"), by his attorneys Trevett Cristo, P.C., Lucinda Lapoff, Esq. and Joseph Gawlowicz, Esq., of counsel, seeks redress for defendants' unlawful age and disability discrimination against him, breach of contract, and for retaliating against him for taking action as a whistleblower under New York State Law while he was employed with defendant City of Rochester ("Rochester" or "City"), under the management of defendant Laura C. Miller, aider and abettor.

## PARTIES

1.      Plaintiff, Robert Mulvaney, is a natural person who resides in the City of Rochester, County of Monroe, and State of New York.

2.      At all times hereinafter mentioned, Defendant City of Rochester (the "City") is a municipality located within the County of Monroe, and State of New York. At all relevant times, the City has been and is an "employer" of Mr. Mulvaney as that term is defined by the statutes at issue herein.

3.      At all times hereinafter mentioned, Defendant Laura C. Miller was and is a resident of the State of New York, County of Monroe, and was employed by the City of

Rochester as Parking Director. Ms. Miller actively and knowingly engaged in acts or omissions that aided or abetted discriminatory actions against Mr. Mulvaney.

## JURISDICTION AND VENUE

4.      Mr. Mulvaney asserts claims against Defendants pursuant to the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. §§ 621 *et seq.* ("ADEA"); the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. §§ 12101 *et seq.* ("ADA"); the New York Executive/Human Rights Law § 296 ("NY HRL"), and New York Civil Service Law ("NYCSL") § 75-b ("Section 75-b").

5.      Mr. Mulvaney also brings this action against Ms. Miller as aider and abettor pursuant to the New York State Human Rights Law.

6.      Venue is proper because Mr. Mulvaney lives within and Defendants are located within the jurisdiction of the United States District Court for the Western District of New York, and the transaction upon which this action is brought occurred within said District, pursuant to 28 U.S.C. § 1391.

7.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as this action involves federal questions regarding the deprivation of Mr. Mulvaney's rights under the ADEA and the ADA.

8.      The Court has jurisdiction over Mr. Mulvaney's state law claims pursuant to the doctrine of pendant jurisdiction.

9.      On June 8, 2017, Mr. Mulvaney served a notice of claim with the City.

10.     Mr. Mulvaney has filed a charge of discrimination in violation of the ADEA and the ADA, arising out of the facts described herein, with the New York State Division

of Human Rights ("NYSDHR") and the U.S. Equal Employment Opportunity Commission ("EEOC") and is in the process of securing his right to sue letter from the EEOC in regard to his ADA claim.

11.     A right to sue letter is not required for his ADEA claim under federal law.

12.     On February 26, 2018, the NYSDHR found probable cause to believe that defendants engaged in the unlawful conduct complained of, a copy of which is attached as Exhibit A.

13.     Mr. Mulvaney brings this Complaint now so as to preserve his rights under the statutes of limitations applicable to the pendant state law claims at issue.

14.     When the EEOC issues Mr. Mulvaney's right to sue letter, he will seek leave to amend this Complaint to allege exhaustion of administrative remedies.

## STATEMENT OF FACTS

15.     Mr. Mulvaney has been employed by the City of Rochester for more than twenty-six (26) years in various capacities.

16.      Mr. Mulvaney was hired by the City in 1991 as a Construction Supply Handler, and worked in that capacity for approximately ten (10) years.

17.     As a Construction Supply Handler, Mr. Mulvaney's primary job duties were to oversee the tools and supplies used in construction in relation to various City projects.

18.     This included small engine repair, light facility maintenance repair, equipment maintenance, general mechanical repair, as well as money collections.

19.     In 2001, Mr. Mulvaney earned a Masters' Degree in Public Administration with a concentration in general management from the College at Brockport, State University of New York.

20.     Thereafter, Mr. Mulvaney worked for the City as a Building Maintenance Helper, and worked in that capacity for approximately four (4) years.

21.     As a Building Maintenance Helper, Mr. Mulvaney's primary job duties were monitoring facility maintenance, including maintaining light fixtures, operating facility fire suppression system pump at the Public Safety Building, re-setting alarm systems, and other general grounds and facility maintenance.

22.     In addition, while employed as Building Maintenance Helper, Mr. Mulvaney was required to work outside of his job title, as Building Supervisor, and other general grounds and facility maintenance.

23.     In 2005, Mr. Mulvaney became employed by the City as a Management Trainee, and was assigned to the Building Services Bureau.

24.     In that capacity Mr. Mulvaney served as Building Safety Committee Chair, and assisted in developing training, such as lock-out, tag-out training for City skilled trade laborers.

25.     Furthermore, in that role, Mr. Mulvaney worked with employees to resolve workplace safety issues.

26.     Mr. Mulvaney worked in that capacity for approximately one and one-half years.

27.     In 2007, Mr. Mulvaney was promoted to Municipal Assistant.

4

28.     Mr. Mulvaney was briefly assigned to the Parks Department to create and oversee the monument and memorial database.

29.     Mr. Mulvaney was thereafter assigned as Municipal Assistant for the Rochester Water Bureau to oversee the Parking Meter shop, primarily responsible for oversight of daily work functions of the parking mechanics, repairs, meter installs, and general mechanical work.

30.     During that time, Mr. Mulvaney also served on the City of Rochester, Monroe County Traffic Control Board.

31.     As a result of a settlement agreement reached between Mr. Mulvaney and the City of Rochester, in 2010 he was placed in the position of Parking Facility Manager, Bracket 22 (Step H) (the "Settlement Agreement").

32.     As part of the Settlement Agreement, Mr. Mulvaney was provided with retreat rights to the position of Municipal Assistant.

33.     It was further agreed that if the position of Parking Facility Manager was eliminated after July 12, 2011, the City of Rochester would "use its best efforts to find an equivalent position for Robert Mulvaney" should the position of Municipal Assistant not be available.

34.     The intent was to assure Mr. Mulvaney would have access to a comparable position in the event of a reduction in force, and also to ensure that Mr. Mulvaney's Civil Service rights are upheld.

35.     In 2010, the Parking Facility Manager position was a Bracket 22, and the Municipal Assistant position was Bracket 18.

36.     Despite constant turmoil in the Parking Bureau within the Finance Department during that time, Mr. Mulvaney at all times worked consistently and effectively on behalf of the City of Rochester.

37.     Mr. Mulvaney performed duties and responsibilities which went far beyond what is typically expected of a Bracket 22 employee, but rather were equivalent to that of other managers in the City at that time and thereafter.

38.     Therefore, in 2013, as the result of a job audit the Parking Facility Manager position was upgraded to Bracket 26 position.

39.     On September 18, 2017, Mr. Mulvaney filed a verified complaint with the New York Stated Division of Human Rights ("NYS DHR"), charging defendant City of Rochester with an unlawful discriminatory practice relating to employment because of age and disability in violation of the NY HRL, the ADA and the ADEA.

40.     At the time of his NYS DHR complaint he was employed in a temporary Municipal Assistant position in the Parks and Recreation department of the City,

41.     While he was in the Parking Facility Manager position, he asked for reasonable accommodations which were required after he had triple fusion surgery in his back.

42.     His back surgery left him with certain limitations, but he could have performed the essential functions of his position or a similar position with reasonable accommodation from the City.

43.     Therefore, he was a person protected by the ADA and the NY HRL due to disability.

44.     At the time of his NYS DHR complaint, Mr. Mulvaney was over the age of 40.

45.     Therefore, he was a person protected by the ADEA and the NY HRL with regard to age.

46.     After he had surgery, Mr. Mulvaney requested reasonable accommodations by asking for help from his supervisor.

47.     His supervisor, defendant Ms. Laura Miller, refused his requests for help and gave him a hard time about his disability and needing accommodation.

48.     On or about May 18, 2017, he was told that his Parking Facility Manager position, which was a pay grade 26, was being eliminated for the 2017-2018 budget year.

49.     He was offered a temporary Municipal Assistant position at a bracket 18 pay grade, with a salary reduction of $18,000 per year.

50.     This was in spite of the fact that a new position, Supervisor of Structures and Equipment, was created for the budget year 2017-2018 at a bracket 21 pay grade.

51.     Due to a previous settlement agreement with the City, this job should have been offered to him, as further explained below.

52.      The pay grade 21 job is a reduced version of the Parking Facility Manager position, but it was not offered to him.

53.     The person who received the Supervisor of Structures and Equipment position was a probationary City employee who is younger than Mr. Mulvaney and does not require reasonable accommodations for a disability.

54.     Mr. Mulvaney's supervisor, Ms. Laura Miller, consistently refused to provide help to him and failed to engage in the interactive process of determining a reasonable accommodation as required by the ADA.

55.     Every time he asked for help, he was given a hard time by Ms. Miller.

56.     His co-workers knew he had a bad back even prior to his surgery and it was open knowledge in the workplace.

57.     Mr. Mulvaney had injured his back 15 years earlier, so he had back issues prior to his surgery.

58.     He was provided a car at work because the facilities were far apart, but his vehicle was in bad shape and bothered his back.

59.     Other cars, more suitable to his needs, were available, but he had to push to get a different car.

60.     Mr. Mulvaney was specifically denied assistance in November and December of 2016 when he sought it out.

61.     Previously, he had had two employees to assist him.

62.     But Ms. Miller had reassigned both of them to a different supervisor prior to Mr. Mulvaney's surgery.

63.     This left him with nobody to help him even though he needed help.

64.     He was responsible for nine facilities at the time and the facilities were very large.

65.     For example, one small building had 600 light bulbs to be maintained.

66.     After his surgery, he was denied a ladder to help him do his work.

67.     Moreover, he could not get on a ladder after his surgery and needed an accommodation for this function which he was denied.

68.     On one occasion, he asked Ms. Miller to enforce the applicable collective bargaining agreement and have the contractor stack certain boxes.

69.     Despite his expressed disability, she required Mr. Mulvaney to do the heavy lifting required which compromised his back.

70.     Whenever he asked for assistance in relation to his work and his back, Ms. Miller asked him demeaning things, such as why he couldn't change a bulb, why he couldn't do this or that, or why he couldn't pick a hose up.

71.     The questions Ms. Miller asked were demeaning and hurtful, and made him embarrassed and ashamed of his situation of living with a disability.

72.     Ms. Miller made these comments consistently every time he asked for assistance.

73.     He made his limitations known to Ms. Miller and asked for assistance on repeated occasions, yet she demeaned him.

74.     Many of his requests were documented in email exchanges with Ms. Miller.

75.     Ms. Miller asked him to explain his medical situation in an email exchange that included another co-worker, thereby revealing his disability in the workplace.

76.     In addition to being denied the required interactive process and reasonable accommodations for his expressed disability, Mr. Mulvaney was ostracized in the workplace.

77.     He was not invited to certain events that he should have been invited to as a manager, such as a mayor's visit, a NYS Comptroller audit and Christmas party planning.

78.     Ms. Miller routinely excluded Mr. Mulvaney from staff lunches and meetings despite the fact that he was a senior manager and other managers that were similarly situated were included.

79.     Adding to the hostile environment, a coworker made comedic impersonations of Mr. Mulvaney concerning his age and disability, and when he reported this to Ms. Miller, she did not take any action and did not respond to his complaints.

80.     It was clear over the course of time that Ms. Miller did not want him in her workplace due to his disability.

81.     Upon information and belief, Ms. Miller had a hard time understanding that disability and physical limitations do not equate to being a lazy worker.

82.     Mr. Mulvaney was told in May 2017 that his Parking Facilities Manager position was eliminated due to budgetary reasons, yet the City created two new positions: a grade 21 supervisor position and a business analyst.

83.     Mr. Mulvaney was qualified for the supervisor position.

84.     Mr. Mulvaney holds a Master's Degree in Public Administration which equips him for a wide variety of managerial roles in the City.

85.     Much of what the grade 21 supervisor position entailed was encompassed in his senior manager grade 26 role.

86.     Clearly, since he had greater responsibility as the facility manager, he could have done the lower grade position.

87.     Instead, he was demoted and put in charge temporarily of the parking meter shop, a position far inferior to his capabilities and experience.

88.     Moreover, while he could have performed the grade 21 supervisor position, the City installed a much younger, non-disabled probationary employee in that job instead.

89.     Upon information and belief, it is unheard of for a probationary employee to be placed in a management position and promoted six pay grades shortly after being hired.

90.     While the City cited civil service issues, such as his title not being in a direct line for the position, as a pretext for not putting him in the grade 21 supervisor position, other avenues were open to them, such as a New York Civil Service Law § 55(a), Employment of Persons with Disabilities, placement, but nothing was ever offered to him despite his disability.

91.     In short, the City did little, if anything, to provide him a job appropriate to his skills and experience, and in spite of his status as a person with a disability able to do a variety of jobs in the City with or without a reasonable accommodation.

92.     Mr. Mulvaney was ready, willing and able to work in an appropriate position, but the City disregarded his 27 years of service.

93.     Upon information and belief, the person who received the grade 21 supervisor job was in his late 20s and physically fit without any known disabilities.

94.     Upon information and belief, the City does whatever it wants to do with the civil service rules and that there was something that they could have done for him if they had wanted to.

95.     Upon information and belief, the civil service rules are manipulated all the time by the City to suits its needs and whims, and if the City wants to do something, they do it.

96.     Mr. Mulvaney has been moved to the parks department.

97.     He has, however, never worked in the parks department and does not know why he is there, other than the City needed a job to offer him no matter how demeaning the demotion would be.

98.     Ms. Miller's conduct towards Mr. Mulvaney in creating a hostile work environment and treating him differently than others his Grade 26 job was eliminated because he was a direct report to Ms. Miller and she did not want to provide reasonable accommodations for him and wanted someone younger and physically fit to work for her.

99.     In regard to a 2010 settlement agreement that was entered into between the City and Mr. Mulvaney, it included a provision placing him in a municipal assistant position if his Grade 26 job was eliminated to protect him.

100.    Circumstances changed since that settlement agreement, as the Parking Facilities Manager job offered to him at that time was a grade 22, which was four grades above the Municipal Assistant position referenced in the agreement.

101.    Approximately four years ago, the administration decided that he should be promoted to a Grade 26 pursuant to a job audit.

102.    The results of the audit were that he was paid way too little for what he did, so his job was elevated Grade 26.

103.    This was not the same grade 22 job that was in the 2010 settlement agreement and instead of the Municipal Assistant being 4 grades below, it was now 8 grades below where he was placed.

104.    Mr. Mulvaney alleges that the timing of the elimination of his position is suspect.

105.    Ms. Miller asked him in December of 2016 and January of 2017 for doctor's notes.

106.    She wanted specific information about his disability limitations.

107.    Two months later, and after having been subject to a hostile work environment at the hands of Ms. Miller, his position was identified for elimination.

108.    Six months later, his position was eliminated.

109.    The elimination of his specific position was a pretextual excuse for Ms. Miller wanting a younger and non-disabled person in the position.

110.    Throughout his employment with the City, Mr. Mulvaney has consistently raised concerns to Miller regarding the City's failure to comply with its own policies, in addition to various federal and state laws, concerning public health and safety.

111.    Mr. Mulvaney regularly notified Miller and Jones by e-mail of contractor ACME Power Washing, Inc.'s ("ACME") failure to perform in accordance with the service contract reached with the City.

112.    In May 2014 Mr. Mulvaney notified Miller that ACME had failed almost entirely to perform required inspections of City parking facilities, resulting in unsafe and unsanitary conditions to be present.

113.    After reporting concerns about ACME's failures to perform under the service contract which created a substantial and specific danger to the public health or safety, Mr. Mulvaney's employees, including Parking Compliance Monitor Shawn Minley, were reassigned to Parking Auditor Sarah Nowak in retaliation for Mr. Mulvaney's reporting.

114.    Following the transfer of Mr. Mulvaney's employees in February 2015, Nowak received a three (3) bracket pay increase, while Mr. Mulvaney's position was eliminated a little more than two years later.

115.    Mr. Mulvaney raised concerns at that time over the fact that Parking Auditor Nowak's son was hired as a garage attendant, which, upon information and belief violates City policy regarding relationships to a contractor with an active financial interest with the City.

116.    Shortly after Minley's reassignment to Nowak in February 2015, Minley's son was found to be an employee of two of the City's contractors, ALLpro Parking LLC, and ACME, thereby resulting in Minley auditing his son's work.

117.    Mr. Mulvaney raised concerns to Miller over the conflict of interest resulting from Parking Compliance Monitor Minley inspecting and approving his own son's work in City parking facilities, which Mr. Mulvaney regularly identified as being not completed at all, or left in unsafe and unsanitary conditions.

118.    ACME's owner and president, Nathaniel P. Lorenz, was federally indicted in February 2018 in relation to falsification of records, and ACME's failure to perform contracts for which the company was paid more than $1 million.

119.    In September 2012, Mr. Mulvaney notified Barrett and Jones about water leaking into the elevator mechanical room at the High Falls Garage and through high voltage electrical boxes and panels which presented substantial and specific danger to the public health or safety.

120.    From the time when he was hired into the Parking Bureau through and including 2017 Mr. Mulvaney consistently observed or became aware through inspection

reports of the need to replace, repair, maintain, and upgrade components of the fire suppression systems in City parking facilities.

121.    Upon information and belief, the fire suppression systems in the City parking facilities were in states of disrepair and limited functionality as a result of the City's willful deferred maintenance of the systems over the course of many years.

122.    Between 2013 and 2017 Mr. Mulvaney consistently warned Miller of health and safety violations that he observed or was advised as being present in City parking facilities specifically regarding the need for ongoing repairs of fire suppression systems.

123.    During the time when Mr. Mulvaney was consistently reporting safety concerns in connection with the fire suppression system, including to the Fire Marshall's Office, six (6) fires occurred in City parking facilities between June 2015 and March 2017.

124.    In February 2016 a fire occurring at Tower 280 above the Midtown Parking Garage raised serious concerns over fire safety within the parking facility below. Mr. Mulvaney's concerns were intensified as a result of the failed inspections in the garage, as well as the fact that businesses are located directly above the parking facility.

125.    Mr. Mulvaney continued to report to Miller the fire safety concerns and violations which he observed or was notified of through the spring of 2017.

126.    Mr. Mulvaney was notified on or about May 18, 2017 that as of July 1, 2017, his position as Parking Facility Manager would be "eliminated" and he could choose to accept being laid-off, or otherwise accept being re-assigned to the position of Temporary Municipal Assistant, a Bracket 18 position.

127.    The May 18, 2017 letter further provides that Mr. Mulvaney would be placed on a Preferred List for the title of Parking Facility Manager for up to four (4) years, beginning on July 1, 2017.

128.    Mr. Mulvaney's position was eliminated in retaliation for his reporting safety and service concerns in the parking facilities under his supervision to his management and to the City of Rochester Fire Marshall.

129.    Mr. Mulvaney has experienced work-related hostility from his Director, Laura Miller, based on his physical limitations stemming from a permanent work-related injury incurred in the City, which would eventually lead Mr. Mulvaney to undergo back surgery in 2016.

130.    The effect of the re-assignment to Municipal Assistant at Bracket 18 is to drop Mr. Mulvaney eight pay brackets.

131.    The Settlement Agreement requires a "good faith effort" to find Mr. Mulvaney a comparable position to the Parking Facilities Manager position which the City abolished, allegedly for budgetary reasons.

132.    The City's letter additionally indicates that Mr. Mulvaney would be eligible for placement in "comparable lower positions."

133.    However, Mr. Mulvaney was not offered the new Supervisor of Structures and Equipment position, which is comparable to the Parking Facility Manager position, and for which Mr. Mulvaney is qualified based on his work history with the City.

134.    Instead, the position was provisionally offered to a junior and probationary employee, Matthew Snyder, who, upon information and belief, has no record of either reporting safety violations, or of disability.

135.    Likewise, Mr. Mulvaney was not offered the new Business Analyst 1 position, which is also comparable to the Parking Facility Manager.

136.    Upon information and belief, nothing in Mr. Mulvaney's employment record reflected unfavorably upon his qualifications for the Business Analyst 1 position, or the Supervisor of Structures and Equipment position.

137.    As a result of the May 18, 2017 letter, and the City's subsequent action, Mr. Mulvaney filed a Notice of Claim with the City on or about June 7, 2017.

## FIRST CAUSE OF ACTION

### ADEA Disparate Treatment Discrimination

138.    Mr. Mulvaney repeats and realleges each allegation contained in paragraphs 1 through 89 above.

139.    The ADEA prohibits an employer from subjecting an employee to disparate treatment with respect to their terms and conditions of employment because of their age.

140.    At all times relevant to this matter, Mr. Mulvaney was over the age of 40 while employed with Defendants and thus a member of a class of people protected by anti-discrimination provisions of the ADEA.

141.    By defendants' conduct described herein, defendants treated Mr. Mulvaney differently than their other employees in the terms and conditions of his employment in violation of ADEA.

142.    Defendants had knowledge of, or reason to know of, the disparate treatment, and fostered and allowed this environment to exist.

143.    Therefore, defendants have violated the ADEA.

144.     Because of defendants' violation, Mr. Mulvaney has suffered, and continues to suffer, pecuniary losses including lost compensation and benefits, physical and psychological harm, emotional distress, and other damages.

## SECOND CAUSE OF ACTION

## ADEA Hostile Work Environment Discrimination

145.     Mr. Mulvaney repeats and realleges each allegation contained in paragraphs 1 through 96 above.

146.     The ADEA requires employers to provide a work environment for employees that is free of abuse and hostility motivated by an employee's age which alters the terms and conditions of the employee's employment.

147.     By defendants' conduct described herein, a hostile work environment existed, through insults, abuse and other malicious activity and omissions, at Mr. Mulvaney's place of employment, the severity and pervasiveness of which altered the terms and conditions of his employment there.

148.     Defendants had knowledge of, or reason to know of, the hostile and discriminatory work environment that existed, and fostered and allowed this environment to exist.

149.     Therefore, defendants have violated the ADEA.

150.     Because of defendants' violation, Mr. Mulvaney has suffered, and continues to suffer, pecuniary losses including lost compensation and benefits, physical and psychological harm, emotional distress, and other damages.

## THIRD CAUSE OF ACTION

## ADA Disparate Treatment Discrimination

151.    Mr. Mulvaney repeats and realleges each allegation contained in paragraphs 1 through 89 above.

152.    The ADA prohibits an employer from subjecting an employee to disparate treatment with respect to their terms and conditions of employment because of their disability.

153.    Mr. Mulvaney was a qualified person with a disability able to perform the duties of the positions at issue in this matter with or without reasonable accommodation and thus was  a member of a class of people protected by the anti-discrimination provisions of the ADA.

154.    By defendants' conduct described herein, defendants treated Mr. Mulvaney differently than their other employees in the terms and conditions of his employment in violation of ADA.

155.    Defendants had knowledge of, or reason to know of, the disparate treatment, and fostered and allowed this environment to exist.

156.    Therefore, defendants have violated the ADA.

157.    Because of defendants' violation, Mr. Mulvaney has suffered, and continues to suffer, pecuniary losses including lost compensation and benefits, physical and psychological harm, emotional distress, and other damages.

**FOURTH CAUSE OF ACTION**

**ADA Hostile Work Environment Discrimination**

158.    Mr. Mulvaney repeats and realleges each allegation contained in paragraphs 1 through 96 above.

159.    The ADA requires employers to provide a work environment for

employees that is free of abuse and hostility motivated by an employee's disability which alters the terms and conditions of the employee's employment.

160.    Mr. Mulvaney was a qualified person with a disability able to perform the duties of the positions at issue in this matter with or without reasonable accommodation and thus was a member of a class of people protected by the anti-discrimination provisions of the ADA.

161.    By defendants' conduct described herein, a hostile work environment existed, through insults, abuse and other malicious activity and omissions, at Mr. Mulvaney's place of employment, the severity and pervasiveness of which altered the terms and conditions of his employment there.

162.    Defendants had knowledge of, or reason to know of, the hostile and discriminatory work environment that existed, and fostered and allowed this environment to exist.

163.    Therefore, defendants have violated the ADA.

164.    Because of defendants' violation, Mr. Mulvaney has suffered, and continues to suffer, pecuniary losses including lost compensation and benefits, physical and psychological harm, emotional distress, and other damages.

## FIFTH CAUSE OF ACTION

### NY HRL Disparate Treatment Discrimination Based on Age

165.    Mr. Mulvaney repeats and realleges each allegation contained in paragraphs 1 through 102 above.

166.    Section 296 of the New York Human Rights Law prohibits an employer from subjecting an employee to disparate treatment with respect to their terms and

conditions of employment because of their age.

167.    Mr. Mulvaney was over the age of 18 at all times while employed with defendants and thus a member of a class of people protected by the provisions of the NY HRL throughout his employment.

168.    By defendants' conduct described herein, defendants treated Mr. Mulvaney differently than other employees in the terms and conditions of his employment in violation of the NY HRL because of his age.

169.    Defendants had knowledge of, or reason to know of, the disparate treatment, and fostered and allowed this environment to exist.

170.    Therefore, defendants have violated the NY HRL.

171.    Because of defendants' violation, Mr. Mulvaney has suffered, and continues to suffer, pecuniary losses including lost compensation and benefits, physical and psychological harm, emotional distress, and other damages.

## SIXTH CAUSE OF ACTION

### NY HRL Hostile Work Environment Discrimination Based on Age

172.    Mr. Mulvaney repeats and realleges each allegation contained in paragraphs 1 through 109 above.

173.    Section 296 of the New York Human Rights Law requires employers to provide a work environment for employees free of abuse and hostility motivated by an employee's age which alters the terms and conditions of the employee's employment.

174.    By defendants' conduct described herein, a hostile work environment existed, through insults, abuse and other malicious activity and omissions, at Mr. Mulvaney's place of employment, the severity and pervasiveness of which altered the

terms and conditions of his employment.

175.     Defendants had knowledge of, or reason to know of, the hostile and discriminatory work environment that existed, and fostered and allowed this environment to exist.

176.     Therefore, defendants have violated the NY HRL.

177.     Because of defendants' violation, Mr. Mulvaney has suffered, and continues to suffer, pecuniary losses including lost compensation and benefits, physical and psychological harm, emotional distress, and other damages.

## SEVENTH CAUSE OF ACTION

### NY HRL Disparate Treatment Discrimination Based on Disability

178.     Mr. Mulvaney repeats and realleges each allegation contained in paragraphs 1 through 102 above.

179.     Section 296 of the New York Human Rights Law prohibits an employer from subjecting an employee to disparate treatment with respect to their terms and conditions of employment because of their disability.

180.     Mr. Mulvaney was a qualified person with a disability able to perform the duties of the positions at issue in this matter with or without reasonable accommodation and thus was a member of a class of people protected by the anti-discrimination provisions of the NY HRL.

181.     By defendants' conduct described herein, defendants treated Mr. Mulvaney differently than other employees in the terms and conditions of his employment in violation of the NY HRL because of his age.

182.     Defendants had knowledge of, or reason to know of, the disparate

treatment, and fostered and allowed this environment to exist.

183.    Therefore, defendants have violated the NY HRL.

184.    Because of defendants' violation, Mr. Mulvaney has suffered, and continues to suffer, pecuniary losses including lost compensation and benefits, physical and psychological harm, emotional distress, and other damages.

## EIGHTH CAUSE OF ACTION

### NY HRL Hostile Work Environment Discrimination Based on Disability

185.    Mr. Mulvaney repeats and realleges each allegation contained in paragraphs 1 through 109 above.

186.    Section 296 of the New York Human Rights Law requires employers to provide a work environment for employees free of abuse and hostility motivated by an employee's disability which alters the terms and conditions of the employee's employment.

187.    Mr. Mulvaney was a qualified person with a disability able to perform the duties of the positions at issue in this matter with or without reasonable accommodation and thus was a member of a class of people protected by the anti-discrimination provisions of the NY HRL.

188.    By defendants' conduct described herein, a hostile work environment existed, through insults, abuse and other malicious activity and omissions, at Mr. Mulvaney's place of employment, the severity and pervasiveness of which altered the terms and conditions of his employment.

189.    Defendants had knowledge of, or reason to know of, the hostile and discriminatory work environment that existed, and fostered and allowed this environment

to exist.

190.    Therefore, defendants have violated the NY HRL.

191.    Because of defendants' violation, Mr. Mulvaney has suffered, and continues to suffer, pecuniary losses including lost compensation and benefits, physical and psychological harm, emotional distress, and other damages.

## NINTH CAUSE OF ACTION

### NY HRL Aiding and Abetting

192.    Mr. Mulvaney repeats and realleges each allegation contained in paragraphs 1 through 115 above.

193.    It is unlawful under Section 296 of the New York Human Rights Law for an individual to aid and abet an employer's discriminatory or retaliatory conduct made unlawful under the NY HRL.

194.    Defendant Miller directly participated in the conduct complained of herein and thereby aided and abetted the City in its unlawful discriminatory conduct toward Mr. Mulvaney, as described herein.

195.    Therefore, Ms. Miller has violated the aiding and abetting provisions of the NY HRL.

196.    Because of Ms. Miller's violations, Mr. Mulvaney has suffered, and continues to suffer, pecuniary losses including lost compensation and benefits, physical and psychological harm, emotional distress, and other damages.

## TENTH CAUSE OF ACTION

## NEW YORK STATE CIVIL SERVICE LAW § 75-b

197.    Mr. Mulvaney hereby repeats and re-alleges each and every allegation in paragraphs 1 through 54 as if fully set forth herein.

198.    The City subjected Mr. Mulvaney to multiple adverse employment actions because Mr. Mulvaney disclosed and/or objected to an activity, policy or practice of Defendants that is in violation of a law, rule or regulation that creates a substantial and specific danger to the public health or safety.

199.    As a result of Mr. Mulvaney reporting the City's violations of laws, rules and regulations that create a substantial and specific danger to the public health or safety, Mr. Mulvaney was reassigned to a temporary Municipal Assistant at Bracket 18 and dropped eight pay brackets.

200.    These actions were retaliatory in nature designed to punish him for whistleblowing.

201.    The City, by taking the aforementioned retaliatory actions against Mr. Mulvaney, violated NYCSL § 75-b.

202.    As a result, Mr. Mulvaney seeks to recover actual damages, as determined at trial, and punitive damages, as allowed by law, together with his reasonable and necessary attorneys' fees, court costs and interests as allowed by law, and any further damages and equitable relief as determined by the Court.

## ELEVENTH CAUSE OF ACTION
## AGAINST DEFENDANT CITY OF ROCHESTER

### BREACH OF CONTRACT

203.     Mr. Mulvaney hereby repeats and re-alleges each and every allegation in paragraphs 1 through 59 as if fully set forth herein.

204.     The City was required by a Settlement Agreement with Mr. Mulvaney to use its best efforts to find an equivalent position for Mr. Mulvaney should his position ever be eliminated.

205.     The City failed to use its best efforts to find an equivalent position, instead offering such positions to younger, non-disabled, and less-qualified candidates.

206.     The Settlement Agreement requires a "good faith effort" to find Mr. Mulvaney a comparable position to the Parking Facilities Manager position.

207.     The City's letter additionally indicates that Mr. Mulvaney would be eligible for placement in "comparable lower positions."

208.     However, Mr. Mulvaney was not offered the new Supervisor of Structures and Equipment position, which is comparable to the Parking Facility Manager position, and for which Mr. Mulvaney is qualified based on his work history with the City.

209.     Instead, the position was provisionally offered to a much younger and probationary employee, Matthew Snyder, who, upon information and belief, has no record of either reporting safety violations, or of disability.

210.     Likewise, Mr. Mulvaney was not offered the new Business Analyst 1 position, which is also comparable to the Parking Facility Manager.

211.     Mr. Mulvaney is qualified for both the Business Analyst 1 position and the Supervisor of Structures and Equipment position.

212. As a result of the May 18, 2017 letter, and the City's subsequent action, Mr. Mulvaney filed a Notice of Claim with the City on or about June 7, 2017.

213. These breaches caused actual damage to Mr. Mulvaney.

214. Pursuant to its obligations under the Settlement Agreement, Defendant City of Rochester is liable to Mr. Mulvaney.

**WHEREFORE,** Plaintiff Bob Mulvaney prays that this Court grant judgment to him against defendants for the following damages and forms of relief available under the law:

1. A declaration that defendants violated Mr. Mulvaney's rights as protected and secured by the ADEA, the ADA, the NY HRL, the NYCSL § 75-b and breach of contract;

2. An order directing defendants to discontinue and not engage in the future in the discriminatory and retaliatory acts complained of herein toward his or anyone else;

3. An order directing the City to place Mr. Mulvaney in a position equal to the Grade 26 position he was demoted from;

4. An award of back pay and benefits, as well as an equal award in liquidated damages;

5. An award of front pay and benefits, as well as an equal award in liquidated damages;

6. An award of compensatory damages for pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses;

7.   An award of punitive damages;

8.   An award of interest;

9.   An award of attorneys' fees, costs and disbursements of this action, including but not limited to expert witness fees; and

10.   Such other and further relief as this Court finds just and proper.

**PLAINTIFF HEREBY DEMANDS TRIAL BY JURY.**

Dated: May 16, 2018

By: /s/ Joseph A. Gawlowicz
Lucinda Lapoff, Esq.
Joseph A. Gawlowicz, Esq.
Trevett Cristo, P.C.
*Attorneys for Plaintiff*
Two State Street, Suite 1000
Rochester, NY 14614
Tel.:    (585) 454-2181
Fax:    (585) 454-4026